Dorothy GAUTREAUX, et al., Plaintiffs,

v.

Samuel R. PIERCE, Secretary of Department of Housing and Urban Development, et al., Defendants.

Nos. 66 C 1459, 66 C 1460.

United States District Court, N. D. Illinois, E. D.

May 11, 1982.

---

See also, D. C., 538 F.Supp. 1009.

Alexander Polikoff, Howard A. Learner, Chicago, Ill., for plaintiffs.

Robert M. Grossman, Roan & Grossman, Patrick W. O'Brien, Mayer, Brown & Platt, Richard J. Flando, Acting Regional Counsel, Dept. of Housing and Urban Development, Stanley J. Garber, Corp. Counsel, Calvin H. Hall, Gen. Counsel, Chicago Housing Authority, Earl L. Neal, Sp. Asst. Corp. Counsel, Chicago, Ill., Jane McGrew, Gershon M. Ratner, Associate Gen. Counsel, Howard M. Schmeltzer, Sp. Asst., Richard C. Stearns, Edward G. Weil, Gen. Counsel, Dept. of Housing and Urban Development, Washington, D. C., Gerald D. Skoning, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This matter is now before the Court on the motion of the Illinois Housing Development Authority ("IHDA"), joined [1] in by plaintiffs, requesting that the Court either enforce or modify the consent decree entered on June 16, 1981, between plaintiffs and the United States Department of Housing and Urban Development ("HUD"). IHDA seeks an order requiring that HUD include a financing adjustment factor ("FAF") in the fair market rents applicable to IHDA financed section 8 housing developments that commence construction after June 1, 1982, so that IHDA-financed developers can charge rents in excess of the normal fair market rent in a particular locale and increase the income stream generated by the development in order to meet higher financing costs. HUD has announced that the FAF currently in effect will not be available for any section 8 developments that begin construction after June 1, 1982.

IHDA [1] advances three grounds in support of its motion to enforce or modify the consent decree. First, it contends that this Court ought to require HUD to continue the FAF with respect to IHDA-financed projects as a means of enforcing paragraph 5.9 of the consent decree which provides, in

---

[1]. As a threshold matter, HUD contends that IHDA lacks standing to invoke this Court's jurisdiction to enforce or modify the decree since it is plaintiffs, not IHDA, who are the intended beneficiaries of the decree. HUD maintains that IHDA is not a party to the consent decree, has no rights under it, and may not seek relief under paragraph 8.1 of the decree which provides that "[j]urisdiction is retained by the Court for the purpose of enabling *plaintiffs and HUD* to apply to the Court at any time for such further orders as may be necessary or appropriate for the construction, implementation, modification or enforcement of this Consent Decree." (Emphasis added.) We need not decide what rights, if any, IHDA may have under the decree at this juncture since plaintiffs have joined in IHDA's motion and adopted it as their own. For convenience, however, the Court will continue to refer to IHDA as the moving party.

pertinent part, that "HUD will explore actively all possibilities of supplying assisted housing to eligible persons as rapidly as possible through the assisted housing programs referred to in this Consent Decree, and through any other housing and housing related programs which may be implemented by HUD prior to the satisfaction or termination of HUD's obligations hereunder. . . ." IHDA's second argument is that the Court should modify the consent decree to provide for the continuation of the FAF for IHDA developments because the FAF was in existence at the time the decree was entered in June, 1981, and the proposed change in circumstances would impose a greater hardship upon IHDA and the plaintiffs than the continuation of the FAF past June 1, 1982, would impose upon HUD. Finally, IHDA contends that the Court should enforce an implied covenant in the consent decree to the effect that HUD not act unilaterally to obstruct the provisions of relief under the decree. As set forth below, we conclude that none of IHDA's arguments would justify the relief it seeks without rewriting the terms of the consent decree, a task which as a general matter we are inclined not to undertake and, under these circumstances, expressly decline to undertake.

In the Court's view, IHDA's attempt to impose an affirmative obligation upon HUD to continue indefinitely the fiscal 1981 FAF by virtue of HUD's undertaking to "explore actively all possibilities of supplying assisted housing to eligible persons as rapidly as possible" reads too much into the limited language of paragraph 5.9. As we stated in an earlier opinion,

> Although we agree with the plaintiffs that paragraph 5.9 of the decree evinces HUD's undertaking to attempt to provide relief as rapidly as possible, though not within a definite time frame, we cannot agree that any time the Court or plaintiffs conclude that HUD might do more to provide housing to eligible persons, the Court may force HUD to take such action under the theory that it is enforcing the decree.

*Gautreaux v. Pierce*, 535 F.Supp. 423, 426 n.4 (N.D.Ill.1982). IHDA acknowledges this to be a correct interpretation of paragraph 5.9 but argues that "paragraph 5.9 clearly calls for action where the appropriate explorations find a promising technique (for which there is statutory authority) of speeding up the delivery of housing opportunities to the plaintiffs." IHDA Memorandum at 9. It then goes on to suggest the following "test" to be applied:

> If the Court finds that the implementation sought (here, reinstatement of the Financing Adjustment) would speed up delivery of relief for the plaintiffs, if the Court finds that the implementation sought is not a novel, untried solution, if the Court finds the improvement to be within HUD's statutory authority, if the Court finds no untoward public effect from the requested implementation, if the Court finds that the implementation requested was known to HUD but not explored actively and in good faith to the end of at least maintaining a reasonably expected rate of relief for plaintiffs and provided the implementation requested is not to have HUD 'perform the functions of a public housing agency,' then this Court ought to affirmatively enforce the Consent Decree by ordering HUD to perform the implementation requested.

*Id.* at 9–10.

The problem, of course, is that the asserted 'call for action' in paragraph 5.9 is extremely weak and the 'test' outlined by IHDA appears nowhere in the decree except by generous implication. Frankly, we have some difficulty discerning the scope of HUD's obligations under paragraph 5.9 and the method of enforcing such obligations, if any, under the decree. In paragraph 8.7 of the decree, for example, the parties provided that "[w]here HUD has agreed in this Decree to . . . explore taking any action not specifically required hereunder, HUD shall undertake such . . . exploration in good faith, but its failure actually to take the action which is the subject of such . . . exploration shall not be grounds for contempt." The purpose of civil contempt is to

coerce compliance with a court order. *See, e.g., Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 349 (7th Cir. 1976), and cases cited therein. The parties having rejected that most obvious option of enforcing paragraph 5.9, it seems somewhat inconsistent to say that the decree implicitly authorizes the Court to accomplish the same result under the name of 'enforcement' or 'implementation' but not 'contempt.' The more logical approach would seem to be to modify the decree, if possible, so as to impose upon HUD an affirmative duty to take the required action, and then to enforce that court-imposed duty, if necessary, through contempt proceedings or otherwise.

Moreover, IHDA's attempt in this context to compare favorably the consent decree and relief requested in the instant case. with that in *New York Association for Retarded Children v. Carey,* 596 F.2d 27 (2d Cir. 1979), is unavailing and, in fact, counterproductive. The consent decree in the New York case, incorporating an independent review and recommendation mechanism for adapting the state's compliance with the decree to changing or new circumstances, was much more flexible than the decree in the case at bar. In addition, rather than merely agreeing to "explore actively" other possibilities for providing relief without the threat of contempt or other sanction, the defendant state officials in the New York case "agreed that 'within their lawful authority' and 'subject to any legislative approval that may be required,' they would 'take all actions necessary to secure implementation of' [certain provisions of the consent decree] as well as 'all steps necessary to ensure the full and timely financing of this judgment,' all in a prompt and orderly manner." *New York State Association for Retarded Children v. Carey, supra,* 596 F.2d at 31. The New York decree apparently also did not rule out the use of the contempt sanction as a means of ensuring the state's compliance. *Id.,* 596 F.2d at 37. Thus, the Court's order in the New York case, requiring the state to implement certain recommendations of the Review Panel established under the decree, did not involve going beyond the four corners of the decree. There was sufficient flexibility in that decree to require the implementation of the particular recommendation involved even though the state in that case was not necessarily required to accept all of the Panel's recommendations under the terms of the decree.

Although we stated earlier that the relief IHDA requests could properly be obtained, if at all, through modification of the decree, IHDA has not met its burden of showing that the decree should be modified under the circumstances presented herein. Even if we assumed, along the lines of the argument put forth by IHDA, that the FAF should be deemed to have been in existence in June, 1981, when the consent decree was entered, we cannot find in the expiration of the FAF effective June 1, 1982, the requisite change in circumstances necessary to justify modification of the decree and continuation of the FAF for projects that commence construction after that date.

The FAF was first instituted in fiscal year 1980 in response to the high interest rates that inhibited financing of housing development by conventional means or through local housing agencies such as IHDA. By applying the FAF to the normal fair market rents computed by HUD, developers could increase the income stream from their section 8 rental property and more readily meet the demands of the high interest rates. The 1980 FAF, however, was only applicable to projects processed for approval by HUD between the effective date of the FAF, July 3, 1980, and the next update of fair market rents scheduled for the beginning of the next fiscal year on October 1, 1980. *See* 45 Fed.Reg. 40111–40112 (June 10, 1980). HUD made no commitment to continue the FAF after that date though it did state that "[w]hen the fair market rents are updated for fiscal year 1981, the Department will consider adopting a similar approach to facilitate adjustments for unanticipated changes in financing costs in future years." *Id.* at 40111.

Initially, the fiscal 1981 fair market rents published in August, 1980 (45 Fed.Reg.

58040) did not include a FAF. In response to the continued pressure of high interest rates, however, HUD proposed a second FAF in October, 1981, effective November 9, 1981, which was made retroactive to October 1, 1980, the beginning of fiscal 1981. *See* 46 Fed.Reg. 51903–51906 (October 23, 1981). The regulations implementing the second FAF expressly provided that it was only applicable to projects that commenced actual construction on or before June 1, 1982. 46 Fed.Reg. 51906; 24 C.F.R. § 888.-101(b)(1) and Note to Schedule A, as amended, October 23, 1981. Moreover, in contrast to the previous year's FAF, the supplementary information accompanying the announcement of the 1981 FAF expressly stated that "[t]he Department will not issue such a procedure for the 1982 FMRs [fair market rents] nor for any subsequent years." 46 Fed.Reg. 51904.

Under these circumstances, it would be unreasonable to require HUD to continue the FAF beyond the June 1, 1982, expiration date. The FAF was never intended to be available for an unlimited period of time nor could it reasonably have been expected to be of unlimited duration. The first FAF was in effect for only a few months and, while the second FAF was in effect for a much longer period, it was expressly terminable on June 1, 1982, from its inception. Even if we were to hold that the FAF should be deemed to have been in existence at the time the consent decree was entered in June, 1981, by virtue of its being applied retroactively from October, 1981, or because of the expectation that a 1981 FAF eventually would be instituted,[2] we cannot say that the expiration of the FAF today constitutes a change in circumstances justifying modification of the decree since that

eventuality was contemplated all along. Accordingly, the threshold requirement for modification of the decree, exceptional circumstances that are new, changed or were unforeseen at the time the decree was entered, is absent.[3]

The Court agrees with IHDA that HUD should not be permitted to unilaterally frustrate the provision of relief under the consent decree by administrative action. However, we do not view the present situation in that light. As we indicated above, HUD has not affirmatively changed its position with respect to the FAF since the decree was entered as it did with respect to the GNMA–Tandem pipeline involved in our earlier order. HUD's decision to allow the FAF to expire without enacting a comparable adjustment for projects that commence construction after June 1, 1982, is somewhat different from its decision to effectively preempt Congressional action on GNMA-Tandem funding by clearing the pipeline of all eligible projects, which the Court did enjoin. In the former instance, there should have been no expectation that HUD would continue to apply a FAF indefinitely, year after year, until the economy improved. In the latter instance, however, plaintiffs could have reasonably expected that HUD would not take steps to eliminate the beneficiaries of a program before Congress acted on the appropriation for the program.

There is, we think, a distinction between requiring a party to an agreement to take additional steps to provide relief, not specifically spelled out in the agreement, even if those steps had been previously employed with success, and preventing a party from taking steps which, if accomplished, would

---

2. Although IHDA has filed an affidavit asserting that it and other state housing finance agencies were continually assured throughout fiscal year 1981 that a FAF would be applied in time for 1981 contract authority, presumably retroactively if necessary, there has been no assertion that IHDA or others could have reasonably expected that there would also be a FAF throughout fiscal 1982 and indefinitely beyond. There is, unfortunately, a difference between an expectation that a particular event

will occur or that a policy will be enacted and a desire that it be so.

3. From a reading of our post decree opinions, it should be apparent that it is the intention of this Court to hold the parties to the bargain they freely and knowingly made in the negotiated consent decree. The Court will not look favorably on future petitions for modification unless the grounds for such relief have been clearly and unequivocally met.

1009

disturb the status quo that would otherwise continue to exist. In the second situation, frustration of the purposes of the agreement is more readily apparent and avoidable. At this juncture, we do not view HUD's failure to act as an effort to frustrate relief under the consent decree.

Accordingly, IHDA's motion, joined by plaintiffs, is denied. It is so ordered.